# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-21-00231-CV

_____

## IN THE INTEREST OF J.C.W., K.R.W., AND B.L.W.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 19-05-07109-CV

## MEMORANDUM OPINION

Mother appeals the trial court's termination of her parental rights to her children, J.C.W. (Jerry), K.R.W. (Kim), and B.L.W. (Bobby). [1,2] On appeal, Mother argues the evidence is insufficient to demonstrate a predicate finding under section 161.001(b)(1), and that termination was not in her children's best interest under

---

[1] We identify children and their family members in parental-rights termination cases by using either initials or an alias to protect the identity of the children. *See* Tex. R. App. P. 9.8(a), (b).

[2] Father does not appeal the termination of his parental rights.

161.001(b)(2) of the Texas Family Code. *See* Tex. Fam. Code. Ann. § 161.001(b)(1)-(2). We affirm.

## I. Background

In May 2019, the Department of Family and Protective Services (the Department) filed its Original Petition for Protection of a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, seeking emergency conservatorship of Jerry, Kim, and Bobby. The trial court granted the emergency application, and the children were removed from their parents and the Department was named sole managing conservator. Later, the trial court signed a temporary order granting the Department temporary conservatorship of the children.[3]

On June 23 and 24, 2021, the trial court held a jury trial. While both Mother and Father were represented by counsel, only Mother appeared for trial.

### A. Evidence at Trial

#### 1. Testimony of Caseworker Laura Casey

Casey testified that she was assigned as the initial caseworker for this matter. She stated that the children were initially removed because of "[c]oncerns for substance abuse and unstable living environment." When she received the case, the

---

[3] At the time of trial, Jerry was seven years old, Kim was five years old, and Bobby was two years old.

Department was not able to locate Mother. For "about a year[]" while Casey handled this case, Mother never contacted the Department or attended any court hearings. Casey developed service plans for both parents, and specifically for Mother requiring her to participate in parenting classes, psychosocial assessment, drug and alcohol assessment, to follow the recommendations of the Department and counselors, to be periodically drug tested, and to maintain a stable home environment. However, Mother never contacted the Department or participated in the services required by the service plan while Casey was assigned this case. Further, Mother never visited or provided financial support for the children during this time.

Casey testified that when the children were removed and placed into the Department's custody, they were initially placed in foster care, but were removed from that placement after the foster parent became "overwhelmed." The children then went to live with their paternal aunt but were removed from that placement when the paternal aunt also became "overwhelmed." The children were then once again placed with the prior foster care provider, but Kim was eventually removed and placed into a therapeutic foster home. Casey stated that during her time on the case, the children's behavior "escalated."

## 2. Testimony of Caseworker Minnesha Fridie-Scott

Minnesha Fridie-Scott was assigned this case after Casey left the Department. Fridie-Scott testified that the children were removed because the parents "were

3

using…drugs and were not supervising their children appropriately." After Fridie-Scott was assigned the case, she was finally able to contact Mother in late May, early June 2020, after previous attempts to contact her. She stated that Mother reached out via text message identifying herself and asking to visit her children. Fridie-Scott then contacted Mother and went over her service plan and visitation schedule. Mother told her the reason she did not contact the Department was because she believed "her case was over." According to Fridie-Scott, Mother's contact with the Department after that initial communication was "not consistent." Mother's contact information constantly changed, and she failed to keep the Department informed as to how to contact her. Fridie-Scott testified that Mother completed some of the services on the service plan, including substance abuse assessment, parenting classes, and a psychological assessment. In regard to her substance abuse assessment, Mother received recommendations for further treatment, but she did not complete the recommendation. Fridie-Scott confirmed that she asked Mother to take three drug tests during this period. Visitation was accomplished over Zoom, and Mother would not appear for every visitation. She stated that during visitation with the children, the children appeared confused about who Mother was. Fridie-Scott testified that Mother never provided financial support, failed to demonstrate any ability to provide a safe and stable home, and did not provide any proof of employment during her time on this case.

Fridie-Scott described the children's behavior as "getting more extreme[]" while in the Department's care. The children were placed in separate foster homes. They had "three to four different placements[]" due to their behavior. The older children's behavior would worsen after each visit with their Mother.

> They were hard to be redirected. [Jerry] had a lot of depression. He was very sad and cried a lot after the visits. He appeared to be just very triggered, angry. He had beg[u]n to vandalize property in the caregiver's home, had trouble at school. He had trouble focusing on Zoom school; and when he went in person, he had trouble there. [Kim], hers was up and down with behaviors, just hard for her to be redirected and for her to follow directives. And [Bobby], he was too little to really understand anything. . . . He would just look and smile and run off.

Fridie-Scott stated that she does not believe the children have any bond with each other. She described what she called "extreme sibling rivalry[]" exacerbated by visits with Mother, when they are all fighting for attention. During this time, the children were receiving counseling.

### 3. Testimony of Caseworker Mercedes Beyan

The final caseworker for the Department, Mercedes Beyan, testified she has been working on the case since November 2020. According to Beyan, she maintained regular contact with Mother until the communication stopped from February to May 2021. In January 2021, Mother told Beyan she did not have a telephone and they were communicating only by email. Beyan was on leave for a month, but when she returned, she sent Mother an email, but Mother did not respond

5

until May 2021. Beyan disputed Mother's excuse for failing to keep in touch by blaming the Department for being unresponsive.

Beyan stated that Mother completed a psychological evaluation as part of her service plan. Mother received recommendations based on that exam and she did not complete those recommendations. Mother also was asked to submit to drug testing, three times in November 2020, twice in December 2020, and monthly until the time of trial. Mother only took two drug tests during that time period. Beyan stated that when Mother contacted her on May 10th, she requested a copy of her family service plan and assistance finding "a rehab" because she admitted to using methamphetamines two weeks prior to their conversation.

According to Beyan, Mother only attended three visitations with the children during the time she was assigned the case and did not provide any financial assistance for the children.

### 4. Testimony of Victoria Warmuth

Victoria Warmuth, a case supervisor with CASA Child Advocates of Montgomery County, testified that a CASA advocate is a guardian ad litem for the children. She described her role in termination cases as working with all parties involved--attorneys, parents, foster parents, doctors, therapists, educators. "We collaborate with each of these parties in order to make informed and educated recommendations to the Court as it relates to best interest for children." Warmuth

explained she has been appointed on this case since the children's removal, and she is the supervisor for the current guardian ad litem.

Warmuth first contacted Mother in May 2020. According to Warmuth, Mother explained her absence during this case, stating that she was in "different relationships and moving to different places." Mother described her relationship with her children as "strained" and stated that she and the children experienced violence from Father. Mother stated she was unemployed, living with her grandmother, and reliant on other people for money. But Mother wanted her children returned to her.

Mother told Warmuth that she had been in a relationship with Father since she was twelve, she moved in with Father when she was eighteen, and there was domestic violence and substance abuse throughout their relationship. She attempted to leave Father on several occasions and was unsuccessful. According to Warmuth, Mother admitted to continuous drug use, stating they used "[a]nything…we could get our hands on." This included daily marijuana usage since she was a teenager and methamphetamine. Mother told Warmuth that Father was abusive to the children and would "put blankets over their heads or in their mouths so that when he was hitting them, they wouldn't scream or cry or they couldn't be heard by other people." Mother never indicated to Warmuth that she ever attempted to intervene in the abuse or contact the police or the Department to stop the abuse. Mother admitted to being

7

in other violent relationships subsequent to her relationship with Father. Warmuth stated she would be concerned about the children's safety with Mother because of substance abuse, domestic violence, instability of home environment, and criminal involvement. She does not believe that Mother has the means to support, protect or provide for her children.

**5. Testimony of Cari Otto**

Cari Otto stated that she is a CASA volunteer and that Warmuth is her supervisor. Otto was assigned to the case in June 2020. Otto visited with the children once a month, either in person or via zoom. Otto stated that the children have been in therapy since she was assigned the case in 2020. Both Jerry and Kim receive medical treatment through prescriptions. In the beginning of the case, she stated that Jerry was "very angry" with "a lot of aggression[.]" His moods would swing from very low to very high. She described Kim as a typical four-year-old, but possessive of her toys, and Bobby was "just baby [Bobby]." Since the children have been in the care of the Department, she has seen Jerry and Kim's behavior improve, and Bobby has remained stable. Otto testified that the boys are in a foster home together and Kim is in a separate foster home, and all are doing "very well."

Otto stated that she spoke with Mother "10 to 12" times since she was assigned the case. She stated that while Mother was scheduled for twenty-one virtual visits with the children, Mother only attended six sessions. She described Mother's

communication with the children during visits as "awkward." Just before trial, Mother contacted Otto in May of 2021 seeking a place to live and asking for suggestions for a substance abuse treatment center. During that conversation, Mother admitted to recently using marijuana and methamphetamines.

Otto testified that CASA's recommendation for the children was that they be placed for adoption, which was in their best interest. She stated the children are "thriving" in their current placements, happy and receiving "consistent love, care, [and] safety." Otto expressed concern that Mother's behavior, including her continued failure to provide a safe and stable home, is not in the children's best interest. She expressed concerns about Mother's current living situation, stating it did not look safe for a two-year-old, and the complete lack of "healthy meals" in the home for the children.

### 6. Testimony of Gloria Kessler

Gloria Kessler testified that she is a licensed professional counselor and a licensed chemical dependency counselor. She performed a substance abuse assessment on Mother. Kessler stated that Mother reported she had "ADD, ADHD, bipolar, and schizophrenia." Mother also reported past drug usage and told Kessler she started using methamphetamines when she met Father. After her initial assessment, Kessler recommended "12 sessions…of individual substance abuse

9

counseling and parenting class[es]." Mother completed three of the twelve substance abuse classes and the parenting class.

### 7. Mother's Testimony

Mother testified that she met Father in "2008, 2009" on the school bus and is still married to him, but they separated three years ago. Mother was eighteen when she moved in with Father and became pregnant with her first child. Father would not allow her to work. Mother never finished high school or obtained her GED. Mother stated that she has not been able to obtain a social security card or driver's license because Father has her birth certificate and driver's license. Mother stated that the abuse started a year after they met and that at first, Father was verbally abusive, but it later escalated to physical abuse. This abuse continued throughout their relationship, and Mother never called the police or obtained a protective order against Father. Father was physically abusive to her in front of the children. She confirmed she reunited with Father briefly in December 2020, before returning to her relationship with her current boyfriend "Jack."

Mother testified that after Jerry and Kim were born, she and Father lived with her grandmother. One time, while staying at his grandmother's house, Jerry became "nonresponsive" and "blue, pale" because of ingesting an opioid pill he found. She stated that the Department opened a case, asked her to do a drug test, and closed the case. Mother explained that she left her children with her grandmother for long

10

periods of time because "that was the safest place[,]" because Father was very abusive to them. Mother was hospitalized once in a psychiatric hospital and testified she attempted suicide on one occasion after she left Father.

At the time of trial, Mother was residing with her boyfriend Jack in Mexia, Texas. She was working on a ranch owned by Jack's grandmother. She stated she never held a job before and does not know how to get a job. Jack's grandmother gave them the travel trailer where they are residing in Mexia. Jack's grandmother pays all their bills. Photographs were admitted at trial showing the condition of the travel trailer. Mother testified the travel trailer appeared clean to her but explained she has a dog. She stated she does not have a lease agreement to live in the travel trailer, because "its family." Mother testified that her current residence is a "work trailer" and that her children would not live there if they were returned to her custody. According to Mother, she has a mobile home in Shepherd that she would eventually move to Mexia. The mobile home has three bedrooms, with beds, food, and clothes ready for the children. She testified Jack's grandparents also own this mobile home. When asked why she did not provide for her children while they were in the Department's custody, she stated, "I didn't know I could." She admitted she did not ask the Department or CASA about providing for her children.

Mother testified she started using methamphetamines with Father, and she reported to her caseworker she last used methamphetamines in May 2021. According

11

to Mother, since the Department removed her children, she used methamphetamine "once or twice. A couple of times. I don't know." Mother testified she last used drugs in May. She admitted her knowledge of Jack's methamphetamine use "in the past."

Mother explained that she did not appear in the case for the first year because Father told her she had "lost her rights[]" and "not to worry about it[.]" She only appeared after she talked to him and found out he lied to her. She stated that she attempted to contact the Department, but no one from the Department contacted her. Mother confirmed she got a copy of her service plan and stated that she completed some of the plan, including substance abuse classes, psychological assessment, and a parenting class, but did not finish her service plan. According to Mother, she did not complete the recommendations because she was not informed about all the recommendations. Mother also admitted that she did not drug test every time the Department requested it. She acknowledged that she was dropped from her substance abuse assessments after she failed a drug test.

Mother believes it is in the children's best interest to be returned to her custody.

> Because I'm their mom. They deserve to be with their mother. They need to be able to have a life that a child needs to have. I need to be a mom for them. I have to be. I -- my mother was never a mom to me. So I want to give my kids what I never got.

She stated that since appearing in this case she has improved in "multiple ways" including her happiness, character, and appearance. She has acquired new skills,

12

obtained gainful employment, has become a better parent, and would protect her children.

**8. Testimony of Mother's Boyfriend Jack**

Jack stated that he has been in a relationship with Mother for fourteen months and he plans to marry Mother. Jack testified that he helps to financially support Mother. He has helped Mother complete "[e]verything that she's got done[]" for the Department. He testified that he and his family would be a support system for Mother and the children. Jack admitted that he has a criminal history involving abuse of controlled substances, specifically methamphetamines. Jack testified that he has never used methamphetamines with Mother. He was released from parole in March 2020 and admitted he has used methamphetamines since.

Jack had a child who passed away while in his custody. He stated that he was asked to do a drug test after his child passed away and tested positive for methamphetamines. A posthumous drug test on his child also revealed the child had methamphetamines in his system. He was in a relationship with Mother at the time his child passed away.

After the conclusion of testimony, a jury returned its verdict to terminate Mother's parental rights, finding predicate violations under section 161.001(b)(1) and that termination was in the children's best interest. Mother timely filed this appeal.

## II. Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction

about the truth of the State's allegations.'" *Id*. (quoting *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*

### III. Analysis

**A. Statutory Grounds D and E**

In her first seven issues, Mother challenges the sufficiency of the evidence to support termination of her parental rights under sections 161.001(b)(1)(B), (D), (E), (F), (N), (O), and (P) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(B)-(P). As to subsection D, Mother argues that the evidence is legally and factually insufficient because there was no evidence that she "allowed the children <u>to remain</u> in conditions or surroundings which endanger" their physical or emotional well-being. (Emphasis original.) As to subsection E, Mother argues the evidence is legally and factually insufficient to demonstrate that she engaged in conduct that endangered her children's emotional or physical well-being.

We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged. *See In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary to address the other predicate grounds because sufficient evidence as to

15

only one ground in addition to the best interest finding is all that is necessary to affirm a termination judgment. *See id.* at 232-33. Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health or to expose a child to loss or injury. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or

16

omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id*. at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id*. at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d at 360). "'[E]ndanger' means to expose to loss or injury[.]'" *In re N.S.G.,* 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In addition, a pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196-97 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.,* No. 09-18-00436-CV, 2019 WL 1561824, at *6 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[ ]"). A parent's continued drug use when the custody of her child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62

18

(citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). Further, a factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because she was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

The jury heard evidence of Mother's admitted past and present drug usage, including methamphetamines as recent as May 2021. The Department repeatedly requested her to submit to drug testing, but she failed to go to monthly drug screenings. Mother admitted to not appearing for drug testing, and the jury could have reasonably inferred Mother was avoiding the tests because she was still using illegal drugs. *See id.* The jury heard Mother's testimony that she used methamphetamine and marijuana while in a relationship with Father and additional testimony from the guardian ad litem that she admitted to smoking "[a]nything…we could get our hands on[.]" Mother admitted to drug usage after her children were removed, and evidence demonstrated that she failed to complete recommended substance abuse counseling and was removed for testing positive during the program.

The jury heard from the first caseworker that Mother failed to contact the Department for over a year after her children were removed. Evidence also revealed that Mother failed to maintain regular contact with the Department or provide

19

updated contact information, admitted that she was not working during most of the time the children were removed, she did not have stable housing, and she relied on others for money. The jury heard that Father was physically and emotionally abusive to Mother and the children throughout their relationship, and Mother admitted she did not call the police or otherwise report the abuse. She also did not leave Father, although she stated that she unsuccessfully tried several times. Mother further admitted to being in other abusive relationships after she left Father and after the children were removed, including a brief reconciliation with Father in December 2020.

The factfinder was also presented evidence that Mother currently lives with her boyfriend, an admitted drug user, and after his child passed away while in his care, both the boyfriend and his child tested positive for methamphetamines. Although Mother testified that she is currently employed by her boyfriend's grandparents, she lives in a travel trailer owned by them, without a lease, and the grandparents pay all her bills. Mother testified that she and the children intended to live with her boyfriend if they were returned to her custody. While the jury heard Mother has a mobile home that was also owned by her boyfriend's grandparents, ready for the children with beds and food, that she intended to move to Mexia if the children were returned to her, the jury could reasonably choose to disregard such testimony from Mother as not believable. *In re J.F.C.*, 96 S.W.3d at 266.

20

Deferring to the factfinder's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the factfinder could reasonably have formed a firm belief or conviction that Mother, through her individual acts or omissions or a course of conduct, endangered her children's physical or emotional well-being. *In re J.T.G.,* 121 S.W.3d 117, 127 (Tex. App.—Fort Worth 2003, no pet.). We conclude that the Department established, by clear and convincing evidence, that Mother committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the factfinder could not reasonably have credited in favor of its endangerment findings is not so significant that the factfinder could not reasonably have formed a firm belief or conviction that Mother endangered her children. *See In re J.F.C.*, 96 S.W.3d at 266. As such, we need not address the sufficiency of the evidence to support a violation of subsections B, F, N, O, and P. *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.). We overrule issues two and three, and we decline to address issues one, four, five, six, and seven.

## B. Best Interest of the Children

In her last issue, Mother challenges the legal and factual sufficiency of the evidence to support the factfinder's finding that terminating her parental rights was in the children's best interest. Specifically, Mother argues the evidence is legally and

21

factually insufficient to demonstrate by clear and convincing evidence that termination of her parental rights is in the best interest of the children. She contends that she was in the process of finishing her service plan, was working, had a stable home and family support, has a plan for the children, and will protect and promote their best interest.

Juries have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a

22

reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116. The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[ ]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex.

23

App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental rights may be in the child's best interest when a parent is unable to provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.,* 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.,* 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's

24

best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

As for the desires of the child, the guardian ad litem testified that Mother missed several visitations with her children and described Mother's visits as awkward. The children's behavior was erratic, and Kim had to be placed in a therapeutic foster home. A caseworker testified that the children were not bonded. Mother admitted Father abused the children while in her presence, and she failed to stop it or take actions for authorities to stop it.

Evidence before the jury showed the children were happy and thriving in their current placements. Testimony was also elicited that the current foster parents want to adopt the children if Mother's rights were terminated. The factfinder could have inferred that the children were bonded with their foster placement. Because of the young age of the children, there was no additional evidence presented as to the actual desires of the children. This factor does not weigh heavily in favor of or against terminating parental rights.

Regarding the children's emotional and physical needs now and in the future, and the possible emotional and physical danger to them now and in the future, the record included reports that the children were removed because of instability and drug usage. Mother admitted to drug use in the past, failing to appear for drug testing, and continuing to use methamphetamine and marijuana during the pendency of the

25

case. Mother's current home was at the behest of her boyfriend's grandparents, and, according to the guardian ad litem, was not suitable for children. Mother admitted she does not have a valid driver's license, and evidence showed that she relies on others for support. While Mother testified she has another home for her children, no evidence was admitted of the current condition of the home other than Mother's testimony, and Mother admitted she was not currently living in that home. The jury was entitled to find that this factor weighed in favor of termination.

As to Mother's parental abilities, the evidence showed that Mother failed to comply with several provisions of her service plan. Mother had a history of drug use and inability to protect her children from witnessing and receiving abuse from Father. She also admitted to continuing in abusive relationships after she left Father and attempted to reconcile with Father during the pendency of this case. Her current boyfriend's child passed away while in his care, and both the boyfriend and his child tested positive for methamphetamines. The factfinder could have inferred a lack of parenting skills from Mother. Mother failed to provide proof of a stable and safe home for her children and continues to make questionable decisions regarding her drug use and personal relationships that could endanger her children. This factor weighs in favor of terminating Mother's parental rights.

Regarding the plans for the children, one caseworker testified that when Jerry and Kim entered care, they both had extreme behavioral problems. This behavior

has improved while in foster care, but the children still display extreme sibling rivalry and regress in their behavior when they visit with Mother. The children are receiving therapy and proper medical treatment, they are happy, loved and cared for in their foster placements, and the foster parents wish to adopt the children. The evidence showed that Mother relied on the help of others, and her substance abuse continued to pose a potential risk to the children. CASA testified that terminating Mother's parental rights was in the children's best interest. This factor weighed in favor of terminating parental rights.

Regarding Mother's acts or omissions, evidence showed that Mother has a history of drug abuse and failed to protect herself or her children from abuse, as shown by her entering into abusive relationships after the children's removal. She failed to submit to drug testing during the pendency of the case, and the jury could have inferred that Mother continued to use drugs. Mother failed to provide proof of a stable and safe home, stating her boyfriend's grandparents paid all her bills and owned her travel trailer without any lease in effect. Mother stated she does not have a driver's license. She failed to complete services to address the reasons for the children's removal. She also failed to contact the Department for a significant time after her children were removed, although Mother blamed her failure to contact the Department on Father. Mother did testify she has a home for her children with beds and food but admitted she does not live there now. On this record, we conclude that

the factfinder could have reasonably disbelieved Mother and found Mother's acts and omissions weighed heavily in favor of terminating her parental rights.

Having considered the evidence related to best interest and deferring to the factfinder's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the jury's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the jury's finding that termination of Mother's parental rights is in the children's best interest, and we overrule her last issue.

## IV. Conclusion

Having overruled Mother's issues, we affirm the judgment of the trial court. AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 26, 2021
Opinion Delivered January 20, 2022

Before Kreger, Horton and Johnson, JJ.

28